UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VERONICA PAIGE,<br><br> Plaintiffs,<br><br> V.<br><br>ATRION COMMUNICATION RESOURCES, INC., PAT GRILLO, AND JOHN DOES 1-25 INCLUSIVE, FICTITIOUS NAMED DEFENDANTS, JOINTLY, SEVERALLY, AND IN THE ALTERNATIVE,<br><br> Defendants. | CIVIL ACTION NO. 3:17-cv-00472-PGS-TJB<br><br>Civil Action<br><br>**Return Date October 3, 2019** |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

AIELLO HARRIS MARTH TUNNERO & SCHIFFMAN, PC
140 S. BROADWAY, SUITE 5
PITMAN, NJ 08071
(856) 553-6810
SIONNO@AIELLOHARRIS.COM
Attorneys for Plaintiff Veronica Paige

SEBASTIAN IONNO, ESQ. (NJ Bar ID#025992002)
D. REBECCA HIGBEE, ESQ. (NJ BAR ID#037762003)
Of Counsel and On the Brief

## TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                III

PRELIMINARY STATEMENT                                                 1

LEGAL ARGUMENT                                                        2

I.   DEFENDANT GRILLO IS A "WALKING HR VIOLATION":
     EVIDENCE OF SEXUAL HARASSMENT/HOSTILE WORK
     ENVIRONMENT IS ABUNDANT AND CONFIRMED BY TESTIMONY
     FROM DEFENDANTS' OWN WITNESSES.                                  2

     A.   Legal Standard Under the New Jersey Law Against
          Discrimination.                                            2

     B.   The Evidence of Sexual Harassment Hostile Work
          Environment is Overwhelming and Clearly Meets
          the "Severe and Pervasive" Standard.                        6

          1.   Plaintiff Testified to Numerous
               Instances of Gross Sexual Harassment.                  9

          2.   All of Defendants' Witnesses, Including
               Defendant Grillo, Corroborated
               Plaintiff's Allegations of Sexual
               Harassment.                                           12

          3.   None of Defendants' Witnesses Support
               Defendants' Allegation that Plaintiff
               Used Sexually Inappropriate Language or
               Conduct in the Workplace.                             18

          4.   Even if True, Defendants' Allegation that
               Plaintiff is Foul-Mouthed in Her Personal
               Life and Racist is Irrelevant, As Neither
               is a License to Sexually Harass Her with
               Impunity.                                             20

          5.   Defendant Grillo's Age, Marital Status,
               and Military Service are Irrelevant and
               Not a License or Excuse for His Sexually
               Harassing Conduct.                                   21

I

C.  The Severe and Pervasive Nature of the Sexual Harassment and the Testimony of Defendants' Witnesses Establishes that Defendant Atrion Had No Effective Anti-Harassment Policy.                22

    1.  Defendant Atrion Provides No Training to Its Employees on the Sexual Harassment Policy.                24

    2.  Defendant Atrion's Own Human Resources Employees Have No Understanding of Its Own Policy or the Law Governing Sexual Harassment in New Jersey.                25

    3.  Defendant Atrion Has No Commitment to Enforcing Its Policy or Creating Any Effective Reporting Mechanism and, In Fact, Defendant Atrion's Employees Take No Action on Reported or Witnessed Incidents of Sexual Harassment.                28

D.  Even Though the Law Does Not Require Plaintiff to Report the Sexual Harassment Because the Harasser Was the Owner of Defendant Atrion, Plaintiff Repeatedly Reported the Sexual Harassment to Her Supervisor, As Required by Defendant Atrion's Purported Sexual Harassment Policy, and No Action Was Taken to Remediate or Repudiate the Harassment.                29

II.  PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED BY RECURRING SEXUAL HARASSMENT FROM WHICH THERE WAS NO ESCAPE OTHER THAN TO LEAVE HER EMPLOYMENT.                31

III.  DEFENDANTS FAIL TO MEET THE SUMMARY JUDGMENT STANDARD.                36

CONCLUSION                39

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).   36,37

Burns v. McGregor Electrical Industries,
    955 F.2d 559 (8th Cir. 1992).   7

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)
    (quoting Fed. R. Civ. P. 56(c)).   36,37

Conoshenti v. Public Serv. Elec. & Gas, 364 F.3d 135,
    145-46 (3d Cir. 2004).   36

Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652,
    cert. denied sub. nom.   2

Godfrey v. Princeton Theological Seminary,
    196 N.J. 178 (2008).   3

Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89
    578 A.2d 903 (1990).   2

Henson v. City of Dundee, 682 F.2d 897
    (11th Cir. 1982).   6

Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412
    772 A.2d 34 (App.Div.2001).   32

Kluczyk v. Tropicana Products Inc., 368 N.J.Super. 479
    (App. Div. 2004).   32,33

Lehmann v. Toys R Us, Inc., 132 N.J. 587,
    626 A.2d 445 (1993).   2,4-7,23

Meritor Savings Bank v. Vinson, 477 U.S. 65 (1986).   6

Muench v. Township of Haddon, 225 N.J. Super. 288
    (App. Div. 1992)).   6

Munford v. Barnes & Co., 441 F. Supp. 459
    (E.D. Mich. 1977).   3

Payton v. N.J. Tpk. Auth., 148 N.J. 524 (1997).   23

Peper, 389 A.2d at 477.   3

Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860
        (3d Cir. 1986).                                        36

Rendine v. Pantzer, 141 N.J. 292 (1995).               6

Shepherd v. Hunterton Developmental Center,
        336 N.J.Super. 395 (App. Div. 2001),
        aff'd in relevant part, rev'd in part
        and remanded, 174 N.J. 1 (2002).               7,31,32

Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998).   4,6

University of Medicine & Dentistry of New Jersey v.
        Fuchilla, 488 U.S. 826, 109 S. Ct. 75,
        102 L.Ed 2d 51 (1988).                         2,20,24

**OTHER AUTHORITIES**

N.J.S.A. 10:5-12, et. seq.                            Passim

Model Civil Charge 2.22G(4)(b).                       4

§219(2) of the Restatement (Second) of Agency        4,5

## PRELIMINARY STATEMENT

In the words of Defendant Atrion's own Human Resources employee, Defendant Grillo is a "walking HR violation." The evidence of sexual harassment hostile work environment is abundant, is confirmed by Defendants' witnesses, and easily meets the severe or pervasive standard.

Plaintiff testified to numerous instances of gross sexual harassment and all of Defendants' witnesses, including Defendant Grillo, corroborated Plaintiff's allegations, while none support Defendants' misguided defense that Plaintiff was "just as guilty" as Grillo.

The record also clearly establishes that Plaintiff had no escape from the severe and pervasive sexual harassment. Defendants' witnesses establish Defendant Atrion has no effective anti-harassment policy, provides no training to its employees, has no understanding of its policy or the law, and has no commitment to enforcement.

Even though not required as her harasser was the owner of Atrion, Plaintiff repeatedly reported the sexual harassment to her supervisor and no action was taken. Plaintiff was told directly that nothing would be done because Grillo owned the company.

Plaintiff did not leave work voluntarily but was constructively discharged due to the recurring sexual harassment she had endured for years.

1

Defendants' argument boils down to that Defendant Grillo is harmless, the proverbial dirty old man, whose gross, sexually graphic talk in the workplace is merely playful banter because he never actually intended to engage in any sexual relations with Plaintiff — because, in his words, he "didn't find her attractive."

**LEGAL ARGUMENT**

I.   **DEFENDANT GRILLO IS A "WALKING HR VIOLATION": EVIDENCE OF SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT IS ABUNDANT AND CONFIRMED BY TESTIMONY FROM DEFENDANTS' OWN WITNESSES.**

A.   **Legal Standard Under the New Jersey Law Against Discrimination.**

The New Jersey Law Against Discrimination ("LAD") was first enacted in 1945 and its purpose is "nothing less than the eradication of the cancer of discrimination." Lehmann v. Toys R Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), also Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied sub. nom., University of Medicine & Dentistry of New Jersey v. Fuchilla, 488 U.S. 826, 109 S. Ct. 75, 102 L.Ed 2d 51 (1988). Discrimination based on sex is particularly repugnant in a society which prides itself on judging each individual by his or her merits. Lehmann, 626 A.2d at 452; Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 96, 578 A.2d 903 (1990).

The law recognizes two types of sexual harassment — quid pro quo sexual harassment and hostile work environment sexual harassment. See Lehman, 132 N.J. at 601. Quid pro quo sexual

harassment "occurs when an employer attempts to make an employee's submission to sexual demands a condition of his or her employment. Id. In contrast, hostile work environment sexual harassment "occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." Id. To succeed on a claim of hostile work environment sexual harassment, Plaintiff must present evidence showing that: "the complained of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Lehmann, 132 N.J. at 603-04 (emphasis omitted). When assessing whether the conduct is sufficiently severe or pervasive, courts must view "the totality of the relevant circumstance, which involves examination of (1) the frequency of all the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or sexually offensive utterances; and (4) whether it unreasonably interferes with an employee's work performance." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008).

Hostile work environment sexual harassment occurs when an employer or fellow employees harass an employee because of her/his sex to the point the working environment becomes hostile. Peper, 389 A.2d at 477; Munford v. Barnes & Co., 441 F. Supp. 459, 466

(E.D. Mich. 1977). In Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685, 693-694 (1998), the New Jersey Supreme Court held that even one epithet voiced by a supervisor, if sufficiently severe, can create a hostile work environment under the LAD.

The Lehmann Court further stated, "To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment." Lehmann, 626 A.2d at 453.

An employer is strictly liable for equitable relief to remediate any discriminatory, hostile environment found in the workplace. Lehmann, 132 N.J. at 616-617. However, a claim for compensatory damages is governed by "agency principles". Id. at 619. Under these principles, "an employer whose supervisory employee is acting within the scope of his or her employment [is] liable for the supervisor's conduct in creating a hostile work environment," Id., and even in the more common situation in which the supervisor is acting outside the scope of his or her employment, the employer will be liable in most cases for the supervisor's behavior under the exceptions set forth in §219(2) of the Restatement (Second) of Agency. Id. at 619-620; Model Civil Charge 2.22G(4)(b). An employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor

"to control the day-to-day working environment" facilitates the harassing conduct. Id. at 620; see, Restatement (Second) of Agency, §219(2)(d).

The employer has an affirmative duty under the law to take aggressive steps to avoid and prevent discrimination of all types. Since 1993, when the New Jersey Supreme Court decided Lehmann, supra, the law has clearly required that employers take preventative steps; negligent failure to do so is a basis for liability under the LAD. "Given the foreseeability that sexual discrimination may occur, the absence of effective preventive mechanisms will present strong evidence of an employer's negligence." Id.

Defendants rely on Clayton v. City of Atlantic City, an unreported decision in a case with facts that could not be more different that presented in Plaintiff Paige's matter. Clayton herself testified to a 7-8 year gap between when a fellow officer who was not her supervisor expressed a romantic interest in her (which does not violate the LAD) and disciplinary measures taken against her with either legitimate disciplinary motivation or what Clayton testified to as a "revenge management culture" at the police department under which disfavored officers, male and female, were disciplined aggressively. Further, after a fellow female officer filed a sexual harassment suit against the department, Clayton called in to a radio show and stated that she

5

had many problems with ACPD but sexual harassment was not one of them. Plaintiff Paige testified to·a lengthy pattern of sexual harassment that, despite lulls, never ended until she left her employment.

**B.   The Evidence of Sexual Harassment Hostile Work Environment is Overwhelming and Clearly Meets the "Severe and Pervasive" Standard.**

It is important to note that it is the harassing conduct that must be severe **or** pervasive; Plaintiff need not prove that her injury was severe, nor need she prove that the alteration of conditions of employment was itself severe. Taylor, 706 A.2d. at 692 (citing, Lehmann and Muench v. Township of Haddon, 225 N.J. Super. 288, 299 (App. Div. 1992)); Rendine v. Pantzer, 141 N.J. 292 (1995) (Finding that a LAD Plaintiff can recover for emotional distress even without an expert report.).

A requirement that an employee run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest racial epithets. Meritor Savings Bank v. Vinson, 477 U.S. 65 (1986); Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982); Taylor, 706 A.2d at 691. The Lehmann Court specifically noted that the LAD is not a fault or intent-based statute, finding that a Plaintiff need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment. Lehmann, 132 N.J. at 604. In considering whether there was a

hostile work environment, the Court must not consider individual incidents in isolation, but must look at the overall scenario, considering not only the frequency of the offending conduct but also its gravity. Id.; Shepherd v. Hunterton Developmental Center, 336 N.J.Super. 395, 413 (App. Div. 2001), *aff'd in relevant part, rev'd in part and remanded*, 174 N.J. 1 (2002). In determining whether the conduct complaint of was "severe or pervasive", the Lehmann Court noted that the Court must consider the cumulative effect of the various incidents, stating:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario. (Internal citations omitted).

Lehmann, 132 N.J. at 607.

In that respect, Lehmann was most definitive that the Court must consider the cumulative effect of the various incidents, based upon the notion "that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." Lehmann, supra, citing Burns v. McGregor Electrical Industries, 955 F.2d 559, 564 (8th Cir. 1992).

In Plaintiff Paige's case Defendants' attempt to trivialize the harassment and Plaintiff experienced as playful banter. Defendants' characterization of these incidents of gross sexual harassment as "jovial," "silly," and "playful banter," is

offensive and absurd. As is the argument that Plaintiff encouraged or participated in the conduct because Defendant Grillo now claims without corroboration she once told him her husband was well endowed, she wore an outfit that Defendant Grillo claims Roz Grillo found inappropriate but in which he thought Plaintiff looked "pretty", and because Plaintiff once used profane language on her personal Facebook page in anger – language, it must be noted, Defendants had no knowledge of until after Plaintiff had left Defendant Atrion and could not have provided any basis for Defendant Grillo to believe Plaintiff welcomed his invitations to engage in various sexual acts or to watch pornography in his office.

The Court could take judicial notice that when a person with whom a plaintiff has no intimate relationship repeatedly suggests that she should have sex with him, engage in a "threesome" with him and a female co-worker, shows her pornography in the workplace, tells her he wishes he was under her desk when she is wearing a skirt, and tells her he wishes a woman were under his desk to give him oral sex, that the harassment is certainly not "jovial," "silly," or "playful banter," and is definitely severe and pervasive for purposes of establishing a claim for sexual harassment hostile work environment. This is true even if there were lulls in the harassing acts and Plaintiff was forced to tolerate the harassment for years because she could not find

alternate employment. The law requires that the incidents of sexual harassment be considered together. It is clear from the totality of the circumstances that Defendant Grillo subjected Plaintiff to sexual harassment that was both severe and pervasive, though the LAD requires proof only that the harassment was severe **or** pervasive. Under the governing case law, the Court must take all of the incidents together like the pieces of a puzzle to form a complete picture where, even if the individual acts would not be actionable in and of themselves, when combined, they form the basis of a claim for a hostile work environment that is prohibited under the LAD.

## 1.   **Plaintiff Testified to Numerous Instances of Gross Sexual Harassment.**

Contrary to Defendants' almost frivolous arguments that the incidents of sexual harassment in this matter were "jovial," "silly," or "playful banter," Plaintiff testified to numerous acts of absolutely flagrant and grotesque sexual harassment over the course of her employment. Plaintiff testified in clear and consistent detail to the following incidents:

a.   Defendant Grillo told Plaintiff he could "uncrank" her when she commented that she was in a bad mood or cranky. Exhibit "2" 136:22-137:9; Exhibit "1", 13:11 – 14:20.

b.   Defendant Grillo said to Plaintiff, "Oh, I wish somebody was under my desk, and I wouldn't care if she spit. I'd just have

the carpets cleaned," an obvious reference to a woman under his desk performing oral sex on him and spitting out his ejaculate on his office floor rug. Exhibit "2" 138:16-140:10; Exhibit "1" 16:25-17:23.

c.   Defendant Grillo in Plaintiff's presence in the office told the wife of Defendant Atrion's accountant that he was, "trying to have Ronnie to have sex with me…" as a weight loss method. Exhibit "2" 105:6-107:10.

d.   On Plaintiff's birthday Defendant Grillo told numerous male members of Defendant Atrion's sales staff that he would, "take one for the team and have birthday sex with" Plaintiff. Exhibit "2" 124:8-15; Exhibit "1" 26:7-21.

e.   In the presence of two people, Defendant Grillo told Plaintiff he did not want one of the bananas on her desk but, "[He has] one for [Plaintiff] and it's cream filled," as well as other frequent lewd comments regarding a banana. Exhibit "2" 101:16-102:5.

f.   Defendant Grillo said to Plaintiff and others, "I think we should all go out to lunch and then go a hotel room."  Exhibit "1" 27:2-31:10.

g.   Defendant Grillo called Plaintiff into his office to show her something on her computer. When Plaintiff looked at Defendant Grillo's office computer screen she saw a pornographic video in which a man came to deliver a pizza to a home. A

10

female told him to come in after which she began to perform oral sex on him. Exhibit "2" 85:2-91:25; 92:16-93:14; Exhibit "1" 35:7-24.

h.   Defendant   Grillo   came   into   Farlow's   office   when Plaintiff was there and said, "Oh, my wife is away, I think we should shut the door and have a threesome. I would love to see you guys go at it." Exhibit "2" 112:4-17; Exhibit "1" 25:3-22.

i.   Defendant   Grillo   frequently   called   Plaintiff   the "Hummer Girl," a reference to oral sex.   Exhibit "2" 94:25-95:15.

j.   Plaintiff testified that Defendant Grillo once rubbed Plaintiff's shoulders in a way that was so inappropriate his wife, Roz Grillo, hit him in the head from behind. Exhibit "2" 98:8-99:1.

k.   When Plaintiff would wear a skirt to work Defendant Grillo would make offensive, unwelcome, and sexually suggestive comments to her, such as, "I wish I was sitting under your desk right now."   Exhibit "2" 108:8-17.

l.   Defendant Grillo invited Plaintiff out to lunch and told her she was hired because she had large breasts.   Exhibit "2" 109:12-111:20.

m.   Defendant Grillo once placed an ice pack on his genitals and said, "Oh, I think I need to move this here," as he looked at Plaintiff's breasts. Exhibit "2" 119:11-120:5.

n.   Defendant Grillo told Plaintiff and another female employee, Carol, that they should have some drinks and some sex. Exhibit "2" 137:24-138:5.

o.   On multiple occasions Defendant Grillo asked Plaintiff to have sex with him.   Exhibit "2" 105:6-107:10.

Frankly, it is hard to imagine a more severe or pervasive campaign of sexual harassment.

### 2. All of Defendants' Witnesses, Including Defendant Grillo, Corroborated Plaintiff's Allegations of Sexual Harassment.

All of Defendants' witnesses, Jennifer Farlow, Roz Grillo, Jake Horta, and Defendant Grillo, all testified to Defendant Grillo's sexually harassing conduct in the workplace – corroborating Plaintiff's allegations.

Roz Grillo testified that there was sexual talk in the workplace at Defendant Atrion.

> A. Comments, probably making them, not necessarily directed towards anyone specifically. He would always make a joke, or making joking comments about certain things.
> Q. Did any of that include sexual content?
> A. It may have. I do not recall.
> Q. You say it may have, you just don't remember specifically?
> A. Correct. Okay. So in other words you are not denying that it happened?
> A. Right. (Inaudible) of that nature, but not (inaudible) said in front of me.
> Q. Okay. But it's your testimony that – that you heard him make jokes before and some of it may have included content of a sexual nature?
> A. Sure.
> Q. Okay. That's a yes?

A. Yes, that's a yes.
   Exhibit "1" 49:12-50:8

Q. And you testified earlier that sexual talk did occur
in the workplace, is that correct?
A. By all of the employees, not just -- not just Pat or
Ronnie, or anyone else.
Q. Okay. And did you ever hear Pat Grillo engage in any
what we'll call sexual talk in the workplace?
A. Did I ever hear him?
Q. Yes.
A. Is that what you said? I'm sure I heard comments.
After 32 years I've probably heard something, but I don't
recall anything specific.
Q. Okay. And based on your testimony that, you know,
sexual type talk did occur in the workplace, why would
you testify that you don't believe any of the allegations
in Ms. Paige's complaint of sexual talk in the workplace
occurred?
A. It's not the sexual talk. That she's claiming that he
was specifically requesting things of her and I just
don't -- I just don't understand why he would have done
that.
   Exhibit "1" 54:9-55:24.

Jennifer Farlow, a member of Defendant Atrion's Human
Resources Department, testified that she referred to Defendant
Grillo as "**a walking HR violation**." (Exhibit "3" 60:9-64:23
(Emphasis added)) and testified unequivocally that she has
heard Defendant Grillo engage in sexual talk and sexual jokes while
she has been employed by Defendant Atrion:

Q. During the time that you've been at Atrion have
you ever heard Pat Grillo talk or make sexual jokes?
A. Yes.
Q. Would you be able to approximate the number of
times you heard him make sexual comments or jokes?
A. Oh, on and off throughout the years. I could
not give you a number. I mean, over the course
of 20 years, you know. I mean, he's -- he makes
-- he's made some off comments.
Exhibit "3" 60:9-64:23.

Farlow also testified that she was sure Defendant Grillo made sexual comments or jokes in Plaintiff's presence.

> Q. Have you ever heard Pat make any type of sexual comments or jokes in Ms. Paige's presence?
> A. I'm sure he has…. It's been – you know, he's made comments. She may have been there, she may not have been there. But I would say I'm sure he has…. The only thing that sticks in my mind, and it was in my office, and it was Roz was going to be out of town and he was kind of joking about, oh, Roz is going to be out of town. You know, why don't you come over or something tonight. But it was said in such a, like a jestful way. Not in any kind of serious invitation….
> Exhibit "3" 60:9-64:23.

Farlow testified that the comment Plaintiff testified to when Defendant Grillo placed the ice pack on his genitals after looking at her breasts sounded like something Defendant Grillo would say. Exhibit "3" 69:9-70:11.

Farlow also testified that the birthday sex comment Plaintiff testified to sounded like something Defendant Grillo would say. Exhibit "3" 72:9-16.

Farlow also testified that she may have heard the "uncrank you" comment and that it was something Defendant Grillo would say, but she thought it meant a back rub, not necessarily sex. Exhibit "3" 76:10-77:6.

Farlow also testified that she could see Defendant Grillo say something like "Well, I think we should go have some drinks and go have some sex, what do you think?" Exhibit "3" 78:3-20.

Finally, Farlow confirmed that Defendant Grillo would make these sexually inappropriate remarks in front of his wife, Roz Grillo (Exhibit "3" 78:3-20) and strongly suggested that the sexually inappropriate language continued after Atrion held a management meeting after learning of Plaintiff's lawsuit and its allegations when she admitted and that she "may have" heard sexual comments or jokes in the workplace following that meeting. Exhibit "3" 74:13-15.

Roz Grillo testified that she has over the years heard and been aware of sexual jokes in the office being made by Defendant Grillo and other employees of Defendant Atrion.

> Q. Okay. Now, over the years have you heard your husband make sexual type comments in the workplace?
> A. Define sexual type comments.
> Q. Sure. Any type of comment that would imply, either directly or indirectly, any type of sexual activity, whether it be specific sex acts, whether it be a sexual joke, a comment about someone's body?
> A. Jokes were done in the office by visiting sales reps, my husband included. I wasn't always party to what was going on.
> Q. Did you ever personally hear your husband make jokes of a sexual nature? In the workplace. I'm not -- home I don't care about.
> A. Possibly, yeah.
> Exhibit "4" 25:8-26:9.

Jake Horta testified that he heard Defendant Grillo make sexual comments in the workplace and approximated that he had personally heard Defendant Grillo make sexual comments in the workplace three or four times. Exhibit "5" 21:1-3; 36:8-18.

Horta testified that while she was employed by Defendant Atrion Plaintiff told him Defendant Grillo made sexual comments in front of her and that Defendant Grillo's comments made her uncomfortable and that he believed Plaintiff. Exhibit "5" 20:7-11; 21:1-3; 24:8-25:9.

Horta also testified that he witnessed an interaction between Defendant Grillo and Victoria, a female Atrion employee, in which Defendant Grillo hugged and kissed Victoria in a way that Horta found to be inappropriate. Exhibit "5" 30:17-24.

Robert Johnson, who did work with Defendant Atrion acknowledged to Plaintiff that it was known that Defendant Grillo sexually harassed female employees of Atrion: "…[O]ne day that Bob Johnson was in the office, and I believe it was right after Victoria was hired as the marketing manager, and Mr. Johnson made the comment that well, I hope she knows that you have to put up with or Pat's sexual harassment in order to keep a job here." Exhibit "2" 149:22-150:20.

Even Defendant Grillo himself admitted that he has engaged in sexually harassing conduct in the workplace. First, Grillo testified that Plaintiff's allegations were "ridiculous" because she was "just as guilty as" he was. Exhibit "6" 15:16-16:2. Defendant Grillo based that claim on his allegation that Plaintiff once told him her ex-husband was well endowed and she liked that in a man.  Id. Not one of the other witnesses corroborated Defendant

Grillo's testimony that Plaintiff made the alleged statement about her husband. In fact, not one of Defendants' witnesses other than Defendant Grillo could recall Plaintiff ever making any sexually inappropriate comment in the workplace. Exhibit "5" Ionno Cert. 27:18-29:7; Exhibit "3" Ionno Cert. 60:9-64:23.

Second, Defendant Grillo admitted that it was possible he had made comments of a sexual nature in the offices of Defendant Atrion. Exhibit "6" Ionno Cert. 91:10-12.

Third, Defendant Grillo testified that it was possible he referred to Plaintiff as the "hummer Girl," but claimed it was not in a sexual manner. Exhibit "6" Ionno Cert. 80:19-22.

Fourth, Defendant Grillo also admitted to the "threesome" comment made to Farlow and Plaintiff, though he said he made the comment Plaintiff testified to "not in so many words."

> Q. Have you ever communicated to Ms. Paige that --
> for example, when your wife may have been away-- that
> since your wife is away, that you, Ms. Paige, and
> Ms. Farlow should have a threesome?
> A. Not in so many words.
> Q. Explain then.
> A. You know, we kidded around a lot and I may have
> said something along the lines, hey, Ros is away,
> let's go out, something like that. Again, they both
> laughed. I'm sure Jen took it at what it was, just
> being a - kidding around kind of thing, and I was
> assuming that Ronnie took it the same way. I never
> made a sexual advancement at Ronnie, and I had no
> intention to. And I certainly wouldn't be looking to
> have a threesome with two people in my office.
> Exhibit "6" 82:2-19.

Finally, when asked whether he made the "we should go have some drinks and some sex" comment to Plaintiff, Defendant Grillo's response was that he did not because he did not find her attractive – not that he would never make such a comment to a subordinate employee or that it would be inappropriate – just that he did not because she was not attractive to him. Exhibit "6" 89:19-23.

### 3. None of Defendants' Witnesses Support Defendants' Allegation that Plaintiff Used Sexually Inappropriate Language or Conduct in the Workplace.

None of the witnesses in this case testified to ever having heard Plaintiff use sexually inappropriate language in the workplace, with the exception of Defendant Grillo's self-serving and uncorroborated claim of one instance.

Jake Horta testified that Plaintiff never had sexual conversations with him, he never heard her have sexual conversations with anyone else in the workplace, no one ever told him they found an email sent by Plaintiff to be offensive or inappropriate, and that neither Plaintiff nor he was disciplined for any non-work related emails. Exhibit "5" Ionno Cert. 27:18-29:7.

Nor could Jennifer Farlow recall Plaintiff making any sexual comments or jokes while working for Defendant Atrion. Exhibit "3" Ionno Cert. 60:9-64:23.

Defendant Grillo based his claim that Plaintiff was responsible for his conduct on his allegation that Plaintiff once

told him her ex-husband was well endowed and she liked that in a man. This comment or type of talk from Plaintiff was not corroborated by any other witness and no one testified to Defendant Grillo having told them Plaintiff made such a comment. Defendant Grillo's testimony, in its essence, is that because Plaintiff allegedly once told him her husband had a large penis, he was empowered to sexually harass her for years.

> Q. When you say, "This is ridiculous," what do you mean?
> A. There's no basis.
> Q. No basis for Ms. Paige's claim?
> A. Correct, yes.
> Q. Why do you say that?
> A. Well, I'm being accused of something that Mrs. Paige was more -- just as guilty as I am. She took the time to mention to me about how well endowed her husband was, and she only liked men with large whatever –
> Exhibit "6" 15:16-16:2.

When asked to elaborate on what else Plaintiff said to him of a sexual nature, Defendant Grillo provided absolutely no detail as to any sexually inappropriate comment made by Plaintiff and, instead, provided a detailed and, frankly creepy, description of an allegedly revealing outfit Plaintiff occasionally wore, how he thought she looked "pretty" in it, and how he told her so. The clear import of Defendant Grillo's testimony was that Plaintiff wanted or invited his sexual harassment by the way she looked.

> Q. Besides talking about one of her ex-husband's penises, is there anything else of a sexual nature that Ms. Paige discussed with you?
> A. It wasn't necessarily what she said, just certain things she did.
> Q. Give me an example.

19

A. I'll give you a good example. She mentions in her
deposition that I liked one of her outfits. That
particular outfit a number - she wore it a lot, and a
number of times my wife, who's also with Jen and kind
of handles HR, had mentioned to me that the outfit she
had on wasn't appropriate to be worn in the office.
It was a white skirt that was very see through,
especially if you stood where there was sun behind you
or a light behind you, and had a big slit up the side.
I thought she looked very pretty in it, and I told her
that, you know.
And I've been known to tell a lot of employees I think
they look very nice or I like their outfit, male and
female, and she happened to be one of them. So -- so
if you're wearing suggestive clothing, you know, to
me that's kind of not exactly -- I don't know, just
- I just saw too many things that just -- and, again,
I'm not -- go ahead and ask your questions.
Q. Okay. Did you ever communicate to Ms. Paige that
this white skirt outfit was inappropriate in the
workplace?
A. No, I just told her I thought she looked very nice
with it on.
Exhibit "6" 18:3-19:11.

Aside from the alleged comment about her husband that only

Defendant Grillo testified to, not one witness testified to

Plaintiff making any comment or engaging in any sexually

inappropriate conduct in the workplace, much less conduct or

language that was in the same universe of sexually inappropriate

as that which has been attributed to Grillo by Plaintiff, Farlow,

Horta, Grillo's own wife, and Grillo himself.

> **4.    Even if True, Defendants' Allegation that Plaintiff
> is Foul-Mouthed in Her Personal Life and Racist is
> Irrelevant, As Neither is a License to Sexually
> Harass Her with Impunity.**

Defendants' defense that Plaintiff used profanity in her

personal life and sent allegedly racy or racist joke emails is

victim shaming/blaming and is irrelevant. Even if true, Plaintiff should have been disciplined, not sexually harassed by the owner of Defendant Atrion and the person with ultimate authority to fire her. Two wrongs never make a right - Plaintiff sending Dietz a joke video in which someone during one small part refers to wolf semen is not a justification for sexual harassment from someone who never even knew about the allegedly raunchy video.

Importantly, Defendants have not denied that Defendant Grillo engaged in the conduct alleged, they are seeking to excuse it by casting irrelevant aspersions on Plaintiff based on things that occurred after the sexual harassment began and for which there is no proof Defendant Grillo even knew about. Even if the allegations Defendants make against Plaintiff were proven to be true, neither the LAD, nor any other law allows an exception to the prohibition against sexual harassment hostile work environment when the Plaintiff is less than perfect.

> **5.   Defendant Grillo's Age, Marital Status, and Military Service are Irrelevant and Not a License or Excuse for His Sexually Harassing Conduct.**

Again, Defendants have not denied that Defendant Grillo engaged in the conduct alleged. Apart from attempting to "blame the victim," Defendants' repeatedly suggest that because Defendant Grillo is a veteran and a senior citizen in a long marriage whose wife and son work for him he cannot possibly have meant to sexually

harass Plaintiff – essentially, that he is the proverbial harmless, dirty old man and not a seasoned sexual harasser.

In reality, based on the testimony of Plaintiff and all of Defendants' witnesses, including Defendant Grillo, is in fact a chronic sexual harasser of many women, not just Plaintiff. Nor does the presence of Defendant Grillo's wife in the workplace weaken Plaintiff's claims, as Farlow testified that Defendant Grillo makes sexual comments in front of his wife in the workplace (Exhibit "3" 78:3-20) and Roz Grillo testified that she knew about pervasive sexual talk in Defendant Atrion's offices by many employees, including her husband (Exhibit "4" 25:8-26:9; Exhibit "1" 49:12-50:8, 54:9-55:24).

As with their argument that Plaintiff is to blame, Defendants are seeking to excuse the sexual harassment by pushing irrelevant facts about Defendant Grillo that do not make him more or less likely to be a sexual harasser or ant less liable for the sexually harassing acts that have been substantiated through the record in this matter. While Defendant Grillo's prior service and his long marriage are admirable, neither the LAD, nor any other law allows an exception to the prohibition against sexual harassment hostile work environment for an older, married veteran.

**C.    The Severe and Pervasive Nature of the Sexual Harassment and the Testimony of Defendants' Witnesses Establishes that Defendant Atrion Had No Effective Anti-Harassment Policy.**

The New Jersey Supreme Court set the law that an employer is liable for sexual harassment committed by employees if the employer was negligent in not having an effective policy against sexual harassment. Lehmann v. Toy's R Us, Inc., 132 N.J. 587, 621 (1993). "[W]hen an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 536 (1997)(quoting Lehmann, 132 N.J. at 623). While having measures in place does not automatically establish the employer was not negligent, "the existence of effective preventative mechanisms provides some evidence of due care on the part of the employer." Lehmann, 132 N.J. at 621.

"Effective remedial measures are those reasonably calculated to end the harassment." Lehmann, 132 N.J. at 623. Further, the law has recognized five guidelines for determining whether remedial measures are effective: (1) policies; (2) formal and informal complaint structures; (3) training, mandatory for supervisors and managers and offered for all employees; (4) sensing or monitoring mechanisms to determine if the policies and complaint structures are reliable; and (5) a commitment from upper management confirmed by consistent enforcement of the policy. Id. at 621. "The presence or absence of such programs is not in itself dispositive of employer liability; however, it serves as a strong indicator for

23

whether an employer upheld its duty to remedy allegations of harassment." See Id. at 621-22.

In addition to the severity of the instances of sexual harassment Plaintiff testified consistently to, several things from the testimony of Defendant Atrion's witnesses make it clear that Defendant Atrion has no effective policy to prevent or remediate or repudiate workplace sexual harassment hostile work environment: (1) Defendant Atrion provides no training to its employees on the Sexual Harassment Policy; (2) Defendant Atrion's own Human Resources Employees have no understanding of its own policy or the law governing sexual harassment in New Jersey; (3) Defendant Atrion has no commitment to enforcing its policy or creating any effective reporting mechanism and, in fact, Defendant Atrion's employees take no action on reported or witnesses incidents of sexual harassment.

### 1. Defendant Atrion Provides No Training to Its Employees on the Sexual Harassment Policy.

Universally, Defendant Atrion's employees, including its owner Defendant Grillo, testified that Defendant Atrion provides no training on its sexual harassment policy to its employees.

Jennifer Farlow testified that Defendant Atrion gives no training on the sexual harassment policy to its employees and was unfamiliar herself with the policy, though she did recall that it

24

directed employees to report harassment to their manager, which is what Plaintiff did. Exhibit "3" Ionno Cert., 27:5-31:4.

Rosalind "Roz" Grillo, Defendant Grillo's wife and employee of Defendant Atrion testified that employees did not and do not receive training in the sexual harassment policy. Exhibit "4" Ionno Cert. 20:18-21:5.

Jake Horta testified that he never received any training on Defendant Atrion's sexual harassment or hostile work environment policy and was never told what he should do if a coworker reported to him that she was being sexually harassed or if he observed sexual harassment. Exhibit "5" Ionno Cert. 17:5-18:9.

Defendant Grillo testified consistent with the testimony of Farlow, Roz Grillo and Jake Horta that Defendant Atrion provides no training on its sexual harassment policy to its employees. Exhibit "6" Ionno Cert. 73:3-7; 73:22-74:2.

> **2.  Defendant Atrion's Own Human Resources Employees Have No Understanding of Its Own Policy or the Law Governing Sexual Harassment in New Jersey.**

Farlow testified that a sexual comment in the workplace would not technically violate Defendant Atrion's sexual harassment policy and it would not be addressed unless someone complained about it.

> Q. Okay. If he had made that comment in the workplace, would that have violated the harassment policy that the company has?

A. I guess technically it would have if somebody --
if somebody had complained about it, then it would be
addressed.
Q. But my question was just -- would that comment, if he
made it in the workplace, would it have violated the
company's harassment policy?
A. I don't believe it states that specifically in the
policy. It's if you feel intimidated or – I would
have to double check. But I don't think it was you
can't say certain things. Was that -- is that a
vulgar type thing to say? Absolutely. But I don't
think it states that specifically. I believe our
policy more so states that if you feel that you are
being harassed or anything else, you know. So if
somebody had come to me and said this was, you know,
extremely crude or whatever thing to say, then there
would be a whole situation. As far as, you know
talking to people and finding out what needed to be
done at that point.
Q. Let me ask you, if you had heard Mr. Grillo make that
comment, but no one complained to you, would you do
anything?
A. Probably not.
Exhibit "3" Ionno Cert. 74:22-76:1.

Farlow testified that she did not consider Defendant Grillo's

sexual comments in violation of Atrion's sexual harassment policy

because she thought they were jokes – that she did not view

Grillo's comments as harassment because he was not coercing

Plaintiff into doing anything. Though she simultaneously described

Defendant Grillo as a "walking HR violation."

Q. Did you ever, in hearing one of these comments,
think that it potentially violated the company's
harassment policy?
A. No, because I didn't view it as harassment.
She was – she was not being -- she didn't have
to do anything. She wasn't being coerced into
doing anything. Or she never indicated that she
was offended by anything that was said.
Q. You've -- you've taken it to another -- I'm just
asking you personally.

A. Me personally.
Q. When you heard Pat make sexual comments or jokes,
did you ever think to yourself, I think that comment
may have violated the company's harassment policy?
A. Not our policy. Because I didn't feel our policy
said you can't say jokes. It's if you offend
somebody. And that's really why - I mean, it was
kind of like, we joke around, oh, he's a walking ·
HR violation. But it was kind of - it was in jest.
It was not, Oh, he's an HR problem that has to be
dealt with. **It was just, oh -- just he's a walking
HR violation**. It was me saying that as a joke.
Exhibit "3" 60:9-64:23 (Emphasis added.)

Though Farlow seemed unfamiliar herself with the policy, she

did recall that it directed employees to report harassment to their

manager, which is what Plaintiff did. Exhibit "3" Ionno Cert.,

27:5-31:4.

Likewise, Roz Grillo testified that Defendant Atrion has a

sexual harassment policy, but she was unsure what was meant by a

"mechanism or procedure" for enforcing the policy. Exhibit "1"

Ionno Cert. 54:9-55:24.

Defendant Grillo testified that when Plaintiff allegedly made

the comment to him regarding her ex-husband's penis, he did not

communicate to her that it was inappropriate to talk about in the

workplace because he believed it was in jest and apparently sexual

comments made in jest were not inappropriate.

Q. Okay. When Ms. Paige made the comment that one of
her ex's had a large penis, did you communicate to her
that this was inappropriate conversation in the
workplace?
A. No, because it was said in jest. You know, we were
talking -- I think the conversation started with me
carrying a banana in the office… And so I pretty much

have a banana most times either in my pocket or in my
hand. And she probably made a comment to me -- it was
made to me many times, the same comment, is that a banana
in your pocket or are you glad to see me? I'm sure you've
heard that comment.
Q. Yes. Ms. Paige would make that comment to you?
A. I think she had, but I can't -- I'm not going to say
definitely that she did.
Exhibit "6" Ionno Cert. 21:4-23.

Defendant Grillo testified that he did not ever have any
communications with Plaintiff about sending inappropriate emails
because no one complained about it and if he were to take action
on such conduct he would have to "fire half [his] company, if not
all." Exhibit "6" 27:11-24.

As set forth at great length above, the LAD and its case law
make no distinction between sexually graphic and harassing
comments made with seriousness or in jest. What is clear from the
testimony is that Defendant Atrion's owner and Human Resources
staff have little knowledge of Atrion's sexual harassment policy,
what is required by law, or how to effectively implement or enforce
its policy.

> **3.  Defendant Atrion has No Commitment to Enforcing Its
> Policy or Creating Any Effective Reporting
> Mechanism and, In Fact, Defendant Atrion's
> Employees Take No Action on Reported or Witnessed
> Incidents of Sexual Harassment.**

Farlow testified that a sexual comment in the workplace would
not be addressed unless someone complained about it and that if
she had heard Defendant Grillo make a sexually harassing remark,
but no one complained about it she probably would not have done

28

anything. Exhibit "3" Ionno Cert. 74:22-76:1 Her testimony in this regard supports Plaintiff's testimony that Farlow would laugh at Defendant Grillo's sexually harassing talk in the workplace.

Likewise, Jake Horta testified that he witnessed an interaction between Defendant Grillo and Victoria, a female Atrion employee, that he found to be inappropriate, but that he did not report it to anyone. Specifically, Horta witnessed Defendant Grillo hug and kiss Victoria. Exhibit "5" Ionno Cert. 30:17-24. Horta also testified that he had not been told what he was supposed to do if a coworker reported to him that she was being sexually harassed or if he observed sexual harassment. Exhibit "5" Ionno Cert. 17:5-18:9.

Finally, Plaintiff did report Defendant Grillo's sexual harassment to her direct supervisors, both of whom admitted to her that it was wrong, but told her nothing would be done. (See discussion below.)

   **D.   Even Though the Law Does Not Require Plaintiff to Report the Sexual Harassment Because the Harasser Was the Owner of Defendant Atrion, Plaintiff Repeatedly Reported the Sexual Harassment to Her Supervisor, As Required by Defendant Atrion's Purported Sexual Harassment Policy, and No Action Was Taken to Remediate or Repudiate the Harassment.**

Plaintiff made her first report of Defendant Grillo's sexual harassment to her first supervisor, Anthony Tanzi, who took no action other than to tell her about other instances of Defendant Grillo sexually harassing women in the professional and workplace setting. Exhibit "2" Ionno Cert. 85:2-91:25.

Plaintiff also reported Defendant Grillo's sexual harassment to her second supervisor, Deitz, who told her there was nothing he could do, saying that Defendant Grillo was the owner of Defendant Atrion and he "couldn't go against him." Exhibit "1", Ionno Cert. 13:11 - 14:20.

Plaintiff testified that she did not have any effective outlet for reporting Defendant Grillo's sexual harassment, as Defendant Grillo was the owner of Defendant Atrion, his wife is the Human Resources Director, her assistant for Human Resources (Jennifer Farlow) laughed off Defendant Grillo's sexual harassment, and Plaintiff's supervisor told her directly that he could not and would not do anything about her objections to the sexual harassment because her harasser owned the company. Exhibit "1" Ionno Cert. 25:3-22, 27:19-29:2, 30:10-19.

Plaintiff testified that she reported the cream filled banana comment to her supervisor, Dietz, and he told her there was nothing he could do because Defendant Grillo was the owner of the company, but that if it were his decision he would have fired Defendant Grillo. Exhibit "2" Ionno Cert. 105:6-107:10

Plaintiff had no one in the management of Defendant Atrion to whom she could report Defendant Grillo's sexual harassment who would have taken any effective action to stop it or to remove the harasser from Plaintiff's work environment, "I had nobody," "You

didn't feel comfortable complaining to anybody?" "No, I didn't."
Exhibit "2" 105:6-107:10.

Plaintiff testified that on one occasion Rich Deitz admitted
to her that the things Defendant Grillo said to her were
inappropriate and he would be fired if it were up to Deitz: "[Rich]
said… I know the things that Pat says to you is not
appropriate, and if I owned this company, he would be the
first one I would fire." Exhibit "2" 133:4-16.

Roz Grillo confirmed that Mr. Deitz never reported
Plaintiff's objections to Defendant Grillo's sexual harassment to
her. Exhibit "1" Ionno Cert. 52:3-6.

## II.   PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED BY RECURRING SEXUAL HARASSMENT FROM WHICH THERE WAS NO ESCAPE OTHER THAN TO LEAVE HER EMPLOYMENT.

Defendants argue Plaintiff cannot establish she was
constructively discharged from her employment with Atrion because
she left voluntarily, and it was a planned separation. This argument
ignores the record.

In Shepherd v. Hunterdon Developmental Center, the New Jersey
Supreme Court addressed the requirements for establishing a
constructive discharge claim based on a violation of the LAD and
held:

> There are subtle but discernible differences between the
> standard for a hostile work environment and the standard
> for constructive discharge. The hostile work environment
> claim requires "severe or pervasive" conduct that
> objectively "alters the conditions of employment and is

31

"hostile or abusive." Loss of a tangible job benefit is not necessary for a hostile work environment claim because the harassment itself affects the terms of conditions of employment. In contrast, constructive discharge requires not merely "severe or pervasive" conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it. More precisely, the standard envisions a sense of outrageous, coercive and unconscionable requirements. Simply put, a constructive discharge claim requires more egregious conduct than that sufficient for a hostile work environment claim.

Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 52-53 (2002).

In Kluczyk v. Tropicana Products Inc., 368 N.J.Super. 479 (App. Div. 2004), the plaintiff filed suit against his employer alleging "same sex" harassment and retaliation in violation of the LAD. The plaintiff's complaint also included claims for constructive discharge and/or retaliatory discharge. In affirming a jury award for Plaintiff of $90,911.00 for lost past wages and $118,404.00 for lost future wages the Appellate Division held that in order to "establish a prima facie case of constructive discharge in New Jersey, a Plaintiff must establish that 'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" "[C]onstructive discharge requires… conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428, 772 A.2d 34 (App.Div.2001). More precisely, the standard envisions a "sense of outrageous, coercive

and unconscionable requirements." Id. <u>Kluczyk</u>, 368 N.J. Super. 479, 489-490 (App. Div. 2004).

In this case when the court looks at the totality of the circumstances surrounding Plaintiff's employment at Defendant Atrion it is clear that a reasonable person in Plaintiff's position would rather resign than continue to endure the work environment.

As detailed above, Plaintiff was subjected to a years long campaign of incidents of gross sexual harassment. While admittedly not binding, the decision of the Unemployment Tribunal awarding Plaintiff benefits succinctly illuminates why Plaintiff's separation from employment with Defendant Atrion was a constructive discharge.

> In this case the **claimant left work voluntarily for a specific matter, namely recurring sexual harassment.** First, the Tribunal is charged with deciding whether the sexual harassment in question and for which the claimant left the employment actually took place. **The Tribunal unequivocally finds that the claimant was subjected to sexually laced comments and inuendo from the owner of the company, and that such circumstances contained sexually graphic language.** The claimant's filing of the said lawsuit further buttresses the claimant's credibility. In addition, **the owner's wife who testified for the employer did not reject or deny that her husband made sexually explicit talk in the workplace.** The fact that **the source of the sexual harassment came from the owner of the company presented a significant hurdle for the claimant with regards to seeking a remedy before terminating her own employment;** clearly the employer could not simply eliminate its sole owner. **Although the claimant clearly held onto her employment for quite some time, it does not follow that she ought to cope with such working conditions despite lulls in such working conditions. Furthermore, enduring such behavior from the owner over the course of an extended period of time does**

**not establish that the claimant no longer had good cause for quitting because of "accepting" such condition of work.** Therefore, the Tribunal concludes that the claimant demonstrated good cause for separating herself from employment with the above named employer…. the claimant did not leave work voluntarily without good cause attributable to such work. Exhibit "7" Ionno Cert. (Emphasis added.)

The severe and pervasive sexual harassment has been detailed at great length above and is incorporated here by reference.

While the actual date of Plaintiff's constructive discharge was triggered by her panic over the commencement of her lawsuit against Defendants, it is clear from the record that Plaintiff was forced to leave her employment because she was forced to file suit against her employer due to the recurring sexual harassment she had endured for years. Plaintiff's allegations of severe and pervasive sexual harassment are corroborated by the testimony of Defendants' own witnesses and establish that, at a minimum, Plaintiff was subjected to regular sexual harassment from the owner of Defendant Atrion, Defendant Grillo. The fact that the owner of Plaintiff's employer was her harasser left Plaintiff with no recourse for relief from the harassment other than to ultimately leave the employer. While Plaintiff did stay at Defendant Atrion for some time, she testified that she looked for other employment throughout her time there unsuccessfully and stayed because she

could not be without employment[1]. Exhibit "2" to Ionno Cert. 20:8-16. While Plaintiff did endure the hostile work environment and sexual harassment until she had no choice, that does not lead to a legal conclusion that she is estopped from being affected by the sexual harassment and ought to have to continue to endure it to stay employed, even when the harassment subsides for periods of time. Further, as recognized by the Unemployment Tribunal, "enduring such behavior from the owner over the course of an extended period of time does not establish that the claimant no longer had good cause for quitting because of "accepting" such condition of work." Plaintiff did not leave work voluntarily – she was constructively discharged.

Clearly, based on the totality of the record in this matter it is well-established that Plaintiff had no realistic escape from the sexual harassment other than to leave, as Defendant Atrion was never going to take any action to remediate or repudiate its sole owner's conduct. Every reasonable employee would rather resign that continue to endure the conditions of employment Plaintiff had endured.

Without question it is respectfully submitted that the working conditions as described in the record before the court

---

[1] While Plaintiff did not testify that her educational history hindered her search for alternate employment, Plaintiff did testify that she did not have a GED until later in her time at Defendant Atrion. Exhibit "2" Ionno Cert. 8.

rise to the level necessary to establish a constructive discharge claim.

**III. DEFENDANTS FAIL TO MEET THE SUMMARY JUDGMENT STANDARD.**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the burden of establishing that no genuine issue of material fact remains. "With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.'" Conoshenti v. Public Serv. Elec. & Gas, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting Celotex). "The plain language of Rule 56(c) mandates the

entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 252.

When viewing all the evidence presented in the light most favorable to Plaintiff, it is clear that there are genuine issues of material fact surrounding the claims that Defendants wish to dismiss, which are questions for a jury to decide.

The evidence in the record establishes that, in the words of Defendant Atrion's own Human Resources employee, Defendant Grillo is a "walking HR violation." The evidence of sexual harassment hostile work environment is abundant and is confirmed by testimony from Defendants' own witnesses. The evidence is so overwhelming that it easily meets the severe or pervasive standard in that there are both numerous instances or sexual harassment and several of

them are severe enough in isolation to meet the standard — for example the showing of pornography.

Plaintiff testified to numerous instances of gross sexual harassment and all of Defendants' witnesses, including Defendant Grillo, corroborated Plaintiff's allegations. None of Defendants' witnesses support Defendants' misguided defense that Plaintiff also used sexually inappropriate language or conduct in the workplace. Further, even if true, Defendants' claim that Plaintiff is foul-mouthed in her personal life and racist is irrelevant, as neither is a license to sexually harass her with impunity. Likewise, Defendant Grillo's age, marital status, and military service are irrelevant and not an excuse for his sexually harassing conduct.

The record also clearly establishes that Plaintiff had no escape from the severe and pervasive sexual harassment. The testimony of Defendants' witnesses establishes that Defendant Atrion had no effective anti-harassment policy. Defendant Atrion provides no training to its employees on the Sexual Harassment Policy, its own Human Resources employees have no understanding of its own policy or the law governing sexual harassment in New Jersey, and Defendant Atrion has no commitment to enforcing its policy or creating any effective reporting mechanism. In fact, Defendant Atrion's employees take no action on reported or witnessed incidents of sexual harassment.

38

Even though the law does not require Plaintiff to report the sexual harassment because the harasser was the owner of Defendant Atrion, Plaintiff repeatedly reported the sexual harassment to her supervisor, as required by Defendant Atrion's purported sexual harassment policy, and no action was taken to remediate or repudiate the harassment. What's more – Plaintiff was told directly by her supervisor, the General Manager of the company, that nothing would be done about the sexual harassment she reported.

As to the constructive discharge, the record shows that Plaintiff did not leave work voluntarily, but was constructively discharged due to the recurring sexual harassment she had endured for years. Looking at the totality of the circumstances surrounding Plaintiff's employment at Defendant Atrion it is clear that a reasonable person in Plaintiff's position would rather resign than continue to endure the work environment. It is well-established that Plaintiff had no realistic escape from the sexual harassment other than to leave, as Defendant Atrion was never going to take any action to remediate or repudiate its sole owner's conduct. Every reasonable employee would rather resign that continue to endure the conditions of employment Plaintiff had endured.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

Respectfully submitted,

AIELLO HARRIS

BY: _____
    SEBASTIAN B. IONNO

DRH
cc:  Charles Schalk, Esq. (Via PACER)